## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00338 (TFH)** |
| **v.** | : | |
| | : | |
| **DOVID SCHWARTZBERG,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dovid Schwartzberg ("Schwartzberg") to 120 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.       Introduction

The defendant, Dovid Schwartberg, traveled from New York City to Washington, D.C. and participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

On March 4, 2022, Schwartzberg pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of ninety days' imprisonment is appropriate in this case because Schwartzberg: (1) entered the U.S. Capitol through a broken window within minutes of the second breach of the Senate Wing Doors while the alarms were blaring, (2) after entering,  proceeded to wave and encourage others into the besieged U.S. Capitol; (3) entered and remained in a sensitive area of the Capitol, specifically Senator Merkley's office; (4) took videos then posted them to social media websites about the activities occurring in the U.S. Capitol, (5) remained on the Capitol grounds after exiting the U.S. Capitol, where he filmed the violent destruction of media equipment; (6) admitted to deleting items from his phone, and (7) has failed to consistently comply with the terms of his release in this case, even after receiving a judicial admonishment at his plea hearing.

The Court must also consider that Schwartzberg's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification.  Here, Schwartzberg's participation in a riot that actually succeeded in halting the Congressional certification, combined with h his entry into a sensitive space within the U.S. Capitol, assistance and encouragement of other rioters to enter the building, his celebration of the siege of the Capitol by making posts to social media, and chronic failure to comply with the terms of his release renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 30 (Statement of Offense), at 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –

contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Schwartzberg's conduct and behavior on January 6.

*Dovid Schwartzberg's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Schwartzberg, along with others, traveled from New York City to Washington, D.C. to attend the "Stop the Steal" rally.  After the rally, Schwartzberg walked to the U.S. Capitol building.  He took multiple videos of the massive crowd surging towards the building. Once he arrived at the plaza in front of the Parliamentarian Doors and the Senate Wing Doors, Schwartzberg filmed rioters exiting the Parliamentarian Doors, some of whom appeared to be closing their eyes and experiencing the effects of pepper spray.  Schwartzberg can be heard saying he had water, presumably to flush out the chemicals from one of the rioters' eyes.

Moments before Schwartzberg's entry into the Capitol, officers stood guard attempting to prevent a second breach of the Senate Wing Doors.



(*Senate Wing doors at approximately 2:48 p.m.*)

Two minutes later, Schwartzberg breached the Capitol via a previously broken window while the alarms were blaring inside.   Schwartzberg took videos of the scene as he entered, showing the officers thoroughly outnumbered and overrun. *See*. Exhibit 1.



(*Schwartzberg, circled in red, entering the U.S. Capitol*)

After entering the Capitol, Schwartzberg filmed the officers guarding the area, some of whom were wearing riot gear.  *See* Exhibit 2.  Thereafter, and at multiple times, Schwartzberg returned to the window and attempted to wave and encourage his fellow rioters into the building.

At one point, Schwartzberg stood in the broken window, helped a fellow rioter into the Capitol, and continued to wave at other rioters to enter.  Some of Schwartzberg's efforts to encourage other rioters to breach the Capitol were also documented in a YouTube video at the 16 minute 19 second marker   and   17   minute   02   second   marker.     *Available   at,* *https://www.youtube.com/watch?v=8Vh8wPeo6Jk.*



(*Schwartzberg, circled in red, waving other rioters towards the Capitol*)



(*Schwartzberg, circled in red, leaning outside of the window to entice other rioters*)



(*Schwartzberg, circled in red, waving at fellow rioters*)

After leaving the window area, Schwartzberg walked towards the Crypt but then returned to the Senate Wing door area.  He attempted to wave more people into the Capitol and then took a few steps out towards the crowd before reentering the Capitol building.    Schwartzberg then entered the Crypt, while filming on his cellphone.



*(Schwartzberg, circled in red, entering the Crypt while filming the area)*

Schwartzberg left the Crypt and went to the second floor of the Capitol.  He encountered an officer who directed Schwartzberg to go back downstairs, and Schwartzberg complied. Schwartzberg reentered the Crypt before entering S-140, an office of Senator Jeff Merkley of Oregon.  While the office was not labeled as Senator Merkley's office, the room was clearly a private office, with personal mementos on the walls.  The exact length of time Schwartzberg spent inside of Senator Merkley's office is unknown, but appears to be brief.

Notably, Schwartzberg was not the only rioter to enter Senator Merkley's office on January 6, 2021.  While inside of Senator Merkley's office, Schwartzberg filmed the area, documenting several other rioters inside of the Senator's office including defendant Brandon Fellows, D.D.C. No. 1:21-cr-00083 (TNM).  Schwartzberg filmed Fellows smoking marijuana inside of Senator Merkley's office.   At one point, Fellows extended out what appears to be a marijuana cigarette in the direction of Schwartzberg and in the vicinity of another rioter.  Schwartzberg can be heard on the video recording declining the offer and saying, "I'm good. I'm good. I'm good."  *See* Exhibit 3.  Schwartzberg later posted a portion of this video to TikTok on January 7, 2021.  *See* Exhibit 4.[2]

---

[2] Collectively, the rioters who invaded the office throughout the day – when it should have been a workspace for a Senator during the certification of the Electoral College vote – prompted Senator Merkley to post a video on Twitter at 11:36 p.m. that night chronicling the damage to his office.  *See* Exhibit 5.

In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked. He pointed out how the floor was littered with debris. He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall. He said that the rioters "left a Trump flag here to mark their presence." Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or joint on the floor. In Senator Merkley's words, one could "count this office trashed."



*(screenshot of Schwartzberg TikTok post, Exhibit 4)*

At approximately 3:32 p.m., officers began to clear the Crypt of rioters, including Schwartzberg.  Schwartzberg filmed the officers, who were right behind him, as they were directing people to exit the Capitol.  Schwartzberg continued to film this procession until he departed the Capitol through the Memorial Doors at approximately 3:34 p.m., where he gave a hand gesture, with his palm facing inwards and his middle and index finger extended, then a fist pump into the air as he exited.



(*Schwartzberg, circled in red, heading towards the Memorial Doors*)



(*Schwartzberg, circled in red, giving a peace sign*)



*(Schwartzberg, circled in red, doing a fist pump into the air)*

According to one of the videos Schwartzberg made after exiting the Capitol, at approximately 3:36 p.m., Schwartzberg learned that someone was killed inside of the Capitol. He continued to stay on the Capitol grounds, close to the building, filming several videos until after 5:00 p.m. At approximately 3:54 p.m., Schwartzberg made a selfie video saying he was taking a "friendly stroll in the backyard of Congress" with his "buddies," while briefly panning the camera to officers, who were wearing riot gear. He then stated it was "a nice day in Washington" and proceeded to wink and smile towards the camera. *See* Exhibit 6.

At approximately 4:20 p.m., Schwartzberg returned to the Senate Wing doors and videoed the crowd gathered outside of the doors with the alarms still audible. Approximately a minute later, after Schwartzberg had moved to the ramp leading up to the Senate Wing doors, officers approached the area and began to forcibly move the rioters from that area. Schwartzberg did not immediately depart in response to the police actions. Rather, he continued to film the officers' efforts at ridding the area of Schwartzberg and his fellow rioters. *See* Exhibit 7. Schwartzberg

then remained on the Capitol grounds until after 5:00 p.m. and filmed a fellow rioter destroying media equipment.  *See* Exhibit 8.



(*image from Schwartzberg's cellphone of a rioter destroying media equipment, Exhibit 8*)

Schwartzberg made several posts to social media, such as TikTok (see above from inside of Senator Merkley's office).  For example, on January 7, 2021, he posted a video of another rioter from inside of the Crypt, who was yelling, "I came to live but I am ready to fucking die..." which had over two thousand "likes" and was shared over one hundred times.



On January 6, 2021, Schwartzberg sent several text messages regarding his activity at the Capitol.  He texted that he was "inside [C]ongress" and "I'm in the building."  He also sent two text messages regarding smoking.  In one text, he stated "took a cigarette inside freaking [C]ongress[.]"  In another text, he stated, "I think I'm the first guy in history to have a cigarette in [C]ongress[.]"  A review of CCTV, revealed that Schwartzberg did smoke while inside of the Crypt.

*Schwartzberg's Interview*

On March 11, 2021, FBI agents interviewed Schwartzberg regarding his activities on January 6, 2021.  Schwartzberg asked if the FBI was working full-time to investigate "insurrectionists" and whether his name specifically was reported to the FBI.  He stated he was

13

picked up at approximately 3:00 a.m. on January 6, 2021 by someone he met through a WhatsApp chat group.  They then picked up another individual in New Jersey before driving to Washington, D.C.  While in D.C., he attended the rally to support then-President Trump.  After the rally, he followed the crowd to the U.S. Capitol.  According to Schwartzberg, once he observed people entering the Capitol, he wanted to "be where the action was" and entered the building through a previously broken window.  He claimed that people were entering the building peacefully. Schwartzberg admitted that he was not forced into the building and that he entered willingly.  He added that he was excited while inside the Capitol and not scared.

Schwartzberg stated that he took videos inside of the Capitol including one of a male with a fake red beard sitting inside an office while smoking what Schwartzberg believed to be marijuana.[3]  He did not know this individual.  Schwartzberg also stated that he did not personally witness any violence.  After he left the Capitol, he claimed that he walked around the exterior of the U.S. Capitol with a reporter that he met.  Schwartzberg left the Washington, D.C. area at approximately 9:00 p.m. with the same two individuals he traveled with earlier in the day. Schwartzberg identified himself in a photograph exiting the U.S. Capitol.

During the interview, Schwartzberg showed the agents several videos on his telephone which depicted both the interior and exterior of the Capitol building on January 6, 2021. Schwartzberg agreed to e-mail the FBI a photograph of a male wearing a "PROUD BOYS" hat and two videos from inside of the Capitol.  Schwartzberg stated that he was banned from TikTok for violation of community guidelines due to his postings at the Capitol.  Schwartzberg did not initially want to relinquish his telephone to the FBI because he did not want to incriminate people who appeared on the photos and videos doing "stupid things" at the Capitol.  Schwartzberg also

---

[3] This is likely a reference to Defendant Brandon Fellows, discussed above.

admitted to deleting some content from the phone.  Schwartzberg ultimately agreed to relinquish his telephone for further review by the FBI.

*Schwartzberg's Statement to Probation*

On May 31, 2022, Schwartzberg, through his counsel, provided Probation with a written, unsigned statement titled, "DEFENDANT'S VERSION OF THE OFFENSE[.]" In this statement, Schwartzberg stated that after approximately thirty to forty minutes after the rally, which he attended, his "curiosity got the better" of him and he joined the crowd headed towards the Capitol. Schwartzberg claimed that by the time he arrived he did not observe any signs or fencing around the Capitol.  He added that he was unaware of the protestors attacking Capitol police officers prior to his arrival.  Schwartzberg claimed that when he arrived, he saw what appeared to be hundreds of people making their way inside of the Capitol.   Schwartzberg also stated that "[w]hile I now recognize the wrongful nature of walking through a broken window to enter the Capitol building and encouraging others to do so as well, at the time I really didn't give it too much thought as I was caught up in the moment and the energy of the crowd; I simply joined along with everyone else not wanting to miss out on what appeared to be something historic."  Schwartzberg ended his statement noting that in hindsight, he recognizes how wrongful and inappropriate his actions were.

*The Charges and Plea Agreement*

On April 16, 2021, Schwartzberg was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G) and later arrested on April 20, 2021. On May 3, 2021, Schwartzberg was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 4, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C.

§ 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Schwartzberg agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Schwartzberg now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Schwartzberg faces up to six months of imprisonment and a fine of up to $5,000. Schwartzberg must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C.  § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Schwartzberg's individual conduct, this Court should assess a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Schwartzberg personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Schwartzberg's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Schwartzberg from most other misdemeanor defendants.

While Schwartzberg was not in the wave of rioters who committed the initial breach of the Senate Wing doors, he entered through a broken window within approximately two minutes of the second breach of that entrance.  Not only did he disregard the blaring alarms, police presence, and

the other rioters exiting the Parliamentarian Doors appearing to suffer from the effects of tear gas, but Schwartzberg encouraged other rioters to enter the Capitol through the very window he entered.  Schwartzberg even helped a fellow rioter through the broken window and numerous other rioters entered during his recruitment efforts.  At one point Schwartzberg leaned out of the window to further beckon his fellow rioters to enter the Capitol.  After moving towards the Crypt, he returned to the Senate Wing door area to call for other rioters to enter.  He even took a few steps outside toward the crowd before reentering the Capitol.

Schwartzberg also went into a sensitive space, the office of Senator Merkley, which was trashed by rioters. While Schwartzberg is not alleged to have committed any destruction in that space, he documented some of the bad conduct there, including the smoking of marijuana, then celebrated the incident by posting it to his TikTok account.

Shortly after leaving the Capitol, Schwartzberg learned that someone had died in the Capitol.  Although he expressed initial shock, less than twenty minutes later he made a selfie style video commenting on it being a "nice day" in Washington.  Schwartzberg returned to the area of the Senate Wing Door, where officers began to forcibly clear the area.  Rather than immediately complying, he continued to film the area and the officers.  Even after he had left that immediate area, he continued to film what was occurring until after 5:00 p.m.  Schwartzberg was not deterred even by the death of a fellow rioter.  He merely wanted to be where the "action" was and remained on the grounds for an extensive period of time after being expelled from the Capitol, including the filming of the violent destruction of media equipment.

Schwartzberg should be credited with his willingness to interview with the FBI prior to his arrest, relinquish his telephone to the FBI. January 6 content from that phone.

But Schwartzberg's claim to have only realized the wrongfulness of his actions after January 6 to have been caught up in the moment to give it "too much thought," are not credible. It would not have taken "much thought" to see the patently obvious signs that what he was doing was wrong, such as climbing into the Capitol through a shattered window, filming officers in riot gear, and hearing the building alarms blare.  He exhibited a lack of remorse during his FBI interview when he talked about how he felt excited at the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Schwartzberg's History and Characteristics

As set forth in the PSR, Schwartzberg has no prior criminal history and has maintained employment since October 2021.  Schwartzberg self-reported a mental health history.  While Schwartzberg was evaluated by a health professional in anticipation of his sentencing, the government does not believe the report provided by defense counsel lays the foundation for any mitigation for health considerations.  Moreover, the defendant's lack of compliance with the conditions of his release raises serious concerns about deterrence without incarceration.

As detailed in the PSR, Schwartzberg has not been compliant with the conditions of his release in this case.  According to his supervising pretrial officer, despite his noncompliance being addressed several times, Schwartzberg has a history of failing to attend treatment, failing to maintain communication with the therapist, canceling at the last minute to travel unexpectedly, and not answering the therapist's phone calls or texts.

During his March 4, 2022 plea hearing, Schwartzberg received a judicial admonishment regarding his compliances to the terms of his release.  At the time of the draft PSR, Schwartzberg's supervising pretrial services officer noted that Schwartzberg had improved the preceding couple

of months, although noted that Schwartzberg attendance at treatment remained poor.  Notably, even after the judicial admonishment, he missed treatment on April 4, 2022 and May 12, 2022. More recently, pretrial services moved for this Court to revoke the defendant's condition of release in light of his noncompliance with his mental health treatment and sporadic reporting to his pretrial services officers.  ECF Nos. 35, 39.  Schwartzberg's unwillingness to abide by the terms of his pretrial services further demonstrates that a term of incarceration, not probation, is necessary as a specific deterrence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

 *General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

 The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Schwartzberg's failure to leave Capitol grounds after being dispelled from the Capitol building, postings on social media, saying it was a "nice day in Washington" after learning of the shooting death inside the Capitol that day, and inability to abide by the terms of his pretrial release conditions clearly demonstrate the need for specific deterrence for this defendant.  Not only did Schwartzberg document his activities in and around the Capitol building on January 6, 2021, but he made numerous posts to social media.  While Schwartzberg alleges that he was merely caught up in the moment, he remained on the Capitol grounds after being forced out by officers and returned to the very entrance he previously breached, possibly with the intent to reenter the building.

As noted in the PSR, Schwartzberg has failed to maintain compliance with the terms of his pretrial release.  Even after being judicially admonished at the time of his plea, he has failed to attend two treatment sessions.  If the weight of the pending criminal case and admonishment by this Court has failed to ensure full compliance by Schwartzberg, then the need for specific deterrence is underscored by this noncompliance.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed,

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Schwartzberg has pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. §5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C.

24

Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

When determining the appropriate sentencing recommendation for each defendant, the government considers the aggravating factors for each defendant weighed against any mitigation factors. Schwartzberg participated in a large number of aggravating factors, warranting an appropriate term of imprisonment. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed in *United States v. James Bonet,* 21-cr-121 (EGS); *United States v. Bryan Betancur,* 21-cr-51 (TJK); *United States v. Kelly O'Brien,* 21-cr-633 (RCL); and *United States v. Oliver Sarko,* 21-cr-591 (CKK).

In *Bonet,* the defendant filmed various moments of his approach to the Capitol building and how the rioters were entering the building. The defendant then entered Senator Merkley's office for approximately four minutes and smoked marijuana. The defendant then left the office, went to the Crypt before eventually leaving the Capitol building at approximately 3:26 p.m. The defendant pled guilty to violating 18 U.S.C. § 1752(A)(1), a first degree misdemeanor. The government recommended 45 days' incarceration and one year of probation. The Court sentenced the defendant to 90 days' incarceration and one year of probation.

In *Betancur,* the defendant, while on probation in the state of Maryland, traveled to Washington, D.C. to attend the rally.  He then climbed scaffolding and later entered a sensitive space, specifically ST-2M, for a brief period of time.  The defendant spent several hours on Capitol grounds and made multiple posts on social media.  While the defendant was compliant with the terms of release, he was hostile and uncooperative during the presentence interview. The defendant pled guilty to violating 18 U.S.C. § 1752(A)(1).  The government recommended a term of incarceration of six months, and the Court sentenced the defendant to 4 months' incarceration.

In *O'Brien,* in the months leading up to the siege of the U.S. Capitol, the defendant made multiple social media posts encouraging others to go to Washington, D.C. on January 6, 2021.  The defendant then filmed her journey towards the Capitol building and posted the videos to her Facebook account.  She then entered the Capitol via the Senate Wing doors.  While outside of the Speaker of the House's office suite, the defendant encouraged others to cause destruction to the area and then proceeded to walk through Nancy Pelosi's office suite.   While she herself did not commit destruction, after exiting the office suite, she cheered on another rioter who removed a sign, which was later destroyed, identifying the Speaker of the House's office.   The defendant pled guilty to violating 18 U.S.C. § 1752(A)(1).  The government recommended five months' incarceration and $500 in restitution.  The Court sentenced the defendant to 90 days' incarceration and twelve months of supervised release.

In *Sarko*, the defendant filmed himself outside of the Capitol and posted videos to his Snapchat account.  The defendant entered the Capitol via the Senate Wing doors and eventually made his way to Senator Jeff Merkley's office, where he remained for approximately twelve minutes without disturbing any items inside.  The defendant then continued to document his way through the U.S. Capitol by taking photographs and videos.  The defendant also entered S-145,

which is a conference room used for visiting spouses of U.S. Senators and members of the House of Representatives.  The defendant later stated that he exited the Capitol via either a broken door or window close to the Senate Wing door which he entered.  The defendant pled guilty to violating 40 U.S.C. § 510 (e)(2)(G).  The government recommended 30 days' incarceration, three years' probation, 60 hours of community service, and $500 restitution.  The Court sentenced the defendant to 30 days' incarceration and three years' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     Split Sentences

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of

this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022); *United States v. Caplinger*, 21-cr-00342 (PLF), ECF 74 (D.D.C. August 1, 2022).[7] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter

227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"),

subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from

subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term

of probation.

    First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a)

makes clear that a "defendant who has been found guilty of" any federal offense "shall be

sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically

provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be

sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by

subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[9]

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of

probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

    Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of

probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced

to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant

is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

---

[8] A period of incarceration that does not exceed two weeks followed by a term of probation is also
permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[9] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any
other sentence."  18 U.S.C. § 3551(b).

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).   In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404,

at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Schwartzberg pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[10]

### 2.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Dovid Schwartzberg to 120 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

---

[11] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:       /s/ *Maria Y. Fedor*
MARIA Y. FEDOR
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia
D.C. Bar No. 985823
601 D Street, N.W.
Washington, DC 20530
Maria.Fedor@usdoj.gov